UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ALABAMA
NORTHWESTERN DIVISION

04 MAR 29 PM 1:2

U.S. DISTRICT COURT
N.D. OF ALABAMA

| | | |
|---|---|---|
| CAROLYN M. AUSTIN, | } | |
| Plaintiff, | } | |
| vs. | } | CASE NO. CV 01-B-3028-NW |
| UNIVERSITY OF NORTH ALABAMA, ROBERT L. POTTS, in his official capacity; DR. TOM LOVETT, in his official and in his individual capacity, | } | |
| Defendants. | } | |
| SANDRA POOLE, | } | |
| Plaintiff, | } | |
| v. | } | CASE NO. CV 01-B-3045-NW |
| UNIVERSITY OF NORTH ALABAMA; ROBERT L. POTTS, in his official capacity; DR. TOM LOVETT, in his official and in his individual capacity, | } | |
| Defendants. | } | |

## MEMORANDUM OPINION

Currently before the court is a Motion for Summary Judgment filed in this consolidated action by defendants, the University of North Alabama ("UNA"), Robert L. Potts, and Dr. Thomas Lovett. Plaintiffs, Carolyn M. Austin and Sandra Poole, both females over the age of fifty, individually filed these actions, claiming UNA, their employer, refused to promote them to the position of Associate Director of University Events/Student Life because of their gender in violation of Title VII of the Civil Rights Act of 1964, as well as the Equal Protection Clause of

the Fourteenth Amendment, actionable pursuant to 42 U.S.C. § 1983.  In addition, Austin asserts

claims of age discrimination under both the federal Age Discrimination in Employment Act

("ADEA") and the Alabama Age Discrimination in Employment Act ("AADEA").  Poole asserts

age discrimination claims under only the AADEA.  Upon consideration of the record, the

submissions of the parties, the arguments of counsel, and the relevant law, the court is of the

opinion that defendants' Motion for Summary Judgment is due to be granted.[1]

## I.  Factual Summary

### A.  The Director of University Events Resigns

The University Events Department at UNA ("University Events" or "UE") is organized

within the Student Affairs Division. (Doc. 47, Ex. I ¶ 4 and ex. 1.)  UE manages the production

of campus events, such as concerts, conferences, and summer camps, and it also manages the

operation of the Norton Center and the Gulliot University Center. (Doc. 47, Ex. H ¶ 2.)  A

substantial portion of the revenues that support the operation of  University events is generated

---

[1] At the conclusion of oral argument, the court informed the parties of its intention to
grant summary judgment in favor of defendants.  The court requested that counsel for defendants
prepare a proposed memorandum opinion for the court and required that counsel send a copy of
the proposed opinion to counsel for plaintiffs.  Although the court has made some changes to the
opinion prepared by defendants' counsel, it has adopted a large part of the proposed opinion.
The court is aware of the admonition of the Eleventh Circuit that district courts not delegate "the
task of drafting important opinions to litigants." *Chudasama v. Mazda Motor Corp.*, 123 F.3d
1353, 1373 n. 46 (11th Cir. 1997).  This is an important opinion and the court had reached a firm
decision as to the appropriate outcome before requesting a proposed opinion from defendants'
counsel. Counsel drafted the opinion according to the express instructions of the court as to its
contents.  These instructions were stated to defendants' counsel, with plaintiffs' counsel present,
following oral argument.  Counsel for defendants submitted a thorough, and, in the court's
opinion, well-written proposed Memorandum Opinion.  Counsel for plaintiff Poole submitted
suggested changes to defendants' proposed opinion.  The court has made most of the changes
suggested by Poole's counsel.  Although largely taken from the opinion proposed by defendants'
counsel, the court personally reviewed this opinion and the opinion reflects the court's own
conclusions.

by income-producing summer camps and conferences; the Department does not receive state funds at the same level as other departments. (Doc. 47, Ex. C at 99; Doc. 47, Ex. H ¶ 2.) UE suffered from financial problems in Spring 2001. (Doc. 47, Ex. C at 75-76; Ex. I ¶ 4.)

On March 23, 2001, UE's Director, Connie Walden, submitted her resignation to her supervisor, Dr. Thomas Lovett, Vice-President of Student Affairs and University Counsel. (Doc. 47, Ex. H ¶¶ 2-3.) Walden's resignation, near the end of the Spring semester, placed the University in a difficult position because the summer camps and conferences, which provide the bulk of UE's revenues, were scheduled to begin in a matter of weeks. (Doc. 47, Ex. H ¶ 3; Ex. C at 75-76.)

### B. Kim Greenway Proposes a Plan to Fill the Vacant Position in an Expedited Fashion

Kim Greenway is the Director of the Office of Student Life, which is also situated within the Student Affairs Division. (Doc. 47, Ex. I ¶ 2.) Greenway did not have any direct supervision over UE, but she was familiar with the department, some of its personnel, and its financial issues, having served as its Interim Director in 2000. (*Id.* ¶¶ 2-5.) Greenway suggested to Lovett that the situation might be resolved by merging University Events with the Office of Student Life, under her supervision. (Doc. 47, Ex. C at 77 and ex. 5; Ex. D at 13.) UE would have an Associate Director (not a Director) who would report to Greenway, as the Director of Student Life. (Doc. 47, Ex. C, ex. 6.) Greenway was concerned that funding problems caused by the proration of state-provided funding might prevent the University from filling the Director position, and replacing the UE Director position with a lower-paying Associate Director position would result in immediate savings. (Doc. 47, Ex. I ¶ 3.) As part of her proposal, Greenway

3

recommended Bret Jennings, a twenty-eight year old male, be placed in the Associate Director

position. (Doc. 47, Ex. D at 115-16; Doc. 1 ¶ 10.)

At the time Greenway recommended Jennings, he reported to her in his position as

Coordinator of Intramural Sports and Recreation. (Doc. 47, Ex. I ¶ 5.)  Greenway proposed

Jennings because she knew, within the structure she had proposed, she would be held responsible

for the success of UE, and she wanted someone in the Associate Director position who was

capable of doing the job, based on her first-hand knowledge. (*Id.*; Ex. C at 219-20.)  By

memorandum dated April 2, 2001, Greenway submitted her proposal in writing, where she

stated:

> As per our previous discussions regarding the resignation of Connie Walden, the
> current Director of University Events, and the subsequent vacancy of that
> position, I offer the following proposal that I believe will benefit the University
> during this difficult financial time, with little, if any, interruption in service to
> students and the campus community.
>
> . . . .
>
> I propose that Bret Jennings, currently a coordinator in the office of student life,
> be promoted to an associate director position under my supervision and that he be
> given charge of the University Events area.  Bret has continually displayed
> dependability, initiative, and willingness to learn.  He has been assigned
> numerous responsibilities in his four years as a full time employee, and fulfilled
> all of them at above satisfactory levels.
>
> . . . .
>
> I would like to express that I offer this proposal as a cost-effective solution for the
> University and as an opportunity to utilize current staff in positions for which
> they are qualified, not out of either desire or need to have another department in
> my area.  I do believe, however, that I can offer Bret the supervision needed to
> run the University Events area effectively, and am willing to take on the
> additional responsibility of the department being added to Student Life in order
> that the University may continue to serve its students with as minimal negative
> impact as possible in a cost-effective manner.

4

(Doc. 47, Ex. I ¶ 4; Ex. I, ex. 1.)  Lovett testified he thought Greenway's proposal to merge UE

into Student Life under Greenway's supervision was a good idea for the following reasons:

> I supported merging university events and student life into one department . . .
> because, first, that department had lost money. . . .  [S]everal positions in that
> department, three of them, are totally or partially funded from auxiliary incomes,
> which means it's not a State fund.  They have to earn the money to cover the
> salaries.
>
> Also, summer was coming.  Summer is a time when university events actually
> makes the bulk of its money to support its other activities throughout the year.
> That income is generated from summer camps and conferences.  There was no
> leadership for that department at that time.
>
> Third, there had been a lack of leadership, in my opinion, with the director at that
> time.
>
> . . . .
>
> And I felt the department needed stability. . . .  [T]hat employee group had had
> three different administrative heads in a very short period of time.  So, between
> budget, between a real crunch on time when they had to make their budget and
> with significant turnover in the leadership [of the] department, I thought moving
> university events under student life, at least for a period of time, was a good idea.

(Doc. 47, Ex. C at 98-100.)  Lovett believed Greenway was sincere in her recommendation, and

he thought Jennings was a qualified candidate.  However, he was concerned that there might be

other, more qualified candidates on campus of which he was not aware. (*Id.* at 87-88.)

Greenway and Lovett met with UNA President Robert Potts on or about April 2, 2001, to

discuss the possibility of merging UE into the Office of Student Life. (*Id.* at 98-99; Ex. I ¶ 8.)

During the meeting, Greenway again recommended that Jennings be placed in the Associate

Director position, and Potts responded that he would support that decision. (Doc. 47, Ex. C at

101.)  At the completion of the meeting, they decided to merge UE into the Office of Student

Life, that UE would have an Associate Director, rather than a Director, and that Lovett had the

discretion to decide whether to promote Jennings to Associate Director of UE, or to conduct a search. (Doc. 47, Ex. H ¶ 6.)

### C. The "Brunch Bunch" Meeting

Lovett and the senior administrative staff from the Division of Student Affairs have regularly scheduled meetings in which the group, known as the "Brunch Bunch," discuss work-related issues. (Doc. 47, Ex. C at 203-04.) On April 5, 2001, at the regularly scheduled Brunch Bunch meeting, the group discussed the vacant UE Associate Director position and Greenway's recommendation of Jennings for the position. (*Id.* at 204, 219-21.) The Brunch Bunch debated whether there should be a search or whether Jennings would be placed in the position without a formal search process. (Doc. 47, Ex. H ¶ 9.) Greenway once again stated her recommendation to place Jennings in the position without a search. (Doc. 47, Ex. C at 219-21.) Greenway stated she was going to be responsible for the UE Department and, therefore, she wanted someone in the position she knew could do the job. As Lovett recalled, Greenway stated, "she had responsibility for the area, and she was in charge of it. In other words, it was her reputation on the line, and she wanted someone who she knew could do the job and that Bret Jennings was the person who could do the job." (*Id.* at 219-20.)

Jo Bennett, who attended the Brunch Bunch meeting, testified that Lovett announced at the meeting "make no bones about it," he wanted Jennings in the Associate Director position. (Doc. 68, Ex. 1 ¶ 4.) According to Bennett, Lovett also declared there were no other qualified individuals in the "division." (*Id.* ¶ 8.)

Another attendee, Kim Mauldin, recalled hearing Lovett state: "Make no bones about it, I want Bret Jennings for that position, and Kelly Ford for the position in [Lovett's] office." (Doc.

47, Ex. F at 36.)  Kim Greenway also attended the brunch bunch meetings.  (Doc. 47, Ex. D at 122.)  She recalls being told by Mauldin that Mauldin recalled Lovett saying something to the effect: "Make no bones about it, I want Bret to fill the position."  (*Id.* at 121.)  Greenway then told Mauldin "something along the lines of: I think I'm the one that made that comment."  (*Id.* at 122.)  Greenway then recalled making the comment at a brunch bunch meeting in April, prior to Bret filling the position.  (*Id.*)

### D. Tom Lovett Decides to Post the Position as an Internal Promotion Opportunity

Dr. Lovett decided to post the Associate Director job as an internal promotion opportunity and to form a search committee.[2] (Doc. 47, Ex. H ¶¶ 7-8.)  The day before the Brunch Bunch meeting, Lovett e-mailed the President's Executive Council about the situation in UE and the Office of Student Life created by Walden's resignation, and the need to fill her vacancy, stating his intention "to advertise the [Associate Director] position as an internal promotional opportunity and to do so quickly." (*Id.* ¶ 7 and ex. 2.)  Because UE's summer camps and conferences were to begin in a short time, advertising the position beyond the campus was not feasible. (*Id.* ¶ 7.)  Although not bound to do so,[3] Lovett decided to conduct a search with a selection committee. (Doc. 47, Ex. C at 105.)

---

[2]The power to hire, fire, and to enter into employment contracts at UNA derives from the Alabama Code and is vested in the Board of Trustees, which has delegated that power to the President. (Doc. 47, Ex. C at 49-50, 97-98.)  There is no policy or requirement that a formal search be conducted before a position is filled. (*Id.* at 104, 156; Ex. H ¶ 6, 8.)  In fact, Walden, (the predecessor to Jennings) was promoted to the Director of UE position in the summer of 2000 without any search or selection process. (Doc. 47, Ex. C at 150, 155-56; Ex. B at 105.)

[3]Lovett was free to recommend to the President that Jennings or any other employee be placed in the Associate Director position without the use of a selection committee. (Doc. 47, Ex. C at 104.)  Another option was to rely on the recommendation of the administrator in charge, which in this case was Greenway. (*Id.* at 105; Ex. H ¶ 8.)

### E. Rumors Circulate on Campus

After the Brunch Bunch meeting, a rumor circulated around campus that Lovett had

awarded the Associate Director position to Jennings as part of the proposed reorganization.

(Doc. 47, Ex. C at 87, 275; Ex. D at 107-08.)  Lovett knew about the rumor, and he testified he

had heard that Austin and Poole were planning to sue the University if one of them was not

selected for the position. (Doc. 47, Ex. C at 230-31.)

On Friday, April 13, 2001, Lovett sent an e-mail to the UE staff, which informed them of

his decision to merge UE with the Office of Student Life. (*Id.* at 86 and ex. 7.)  Lovett addressed

directly the rumor that Jennings had already been awarded the position:

> University Events has had three directors in less than a year. . . .  This is not good
> for you as individuals - even though you individually have conducted yourselves
> most professionally - because repeated changes in leadership can result in loss of
> departmental focus.  We have suffered significant losses of revenue not
> necessarily through anyone's fault.  But, this was revenue that you worked hard to
> generate.  With decreasing State support for higher education, University Events
> has more and more become an auxiliary enterprise - which means that no[t] only
> are operational funds dependent upon generated income, so are salaries and jobs.
>
> I am open for alternative ideas, but at this time, I intend to place University
> Events under the Student Life umbrella probably for 2-3 years depending on how
> our revenue stream does.  This will mean some restructuring and probably some
> relocation --- which we discussed somewhat last year.
>
> You probably have heard the speculation about who will have direct
> administrative responsibility for University Events.  Some assume that Bret will
> be appointed.  Such speculation is just that --- speculation.  Certainly, he is
> interested and I have encouraged him to apply.  I have also encouraged anyone
> who is interested to apply and have asked the senior student affairs administrative
> staff to encourage anyone interested from their respective departments to apply.
> The position which will be associate director while University Events is part of
> Student Life, is being advertised by Human Resources as an internal promotional
> opportunity.

(*Id.* at 90-91 and ex. 7.)  Lovett also requested that UE's staff formulate a standard questionnaire for the committee to use to assess each applicant. (*Id.*)  Lovett advised the staff that they would have the opportunity to interview each of the candidates and to provide input to the committee. (*Id.*)

### F.  Plaintiffs Apply for the New Associate Director Position

The position of Associate Director was posted on April 9, 2001, with an application deadline of April 16, 2001. (Doc. 47, Ex. A, ex. 2.)  On April 11, 2001,  Lovett sent an e-mail to several directors asking them to encourage any interested and qualified staff members under their supervision to apply for the position. (Doc. 47, Ex. A, ex. 4.)  The posting resulted in six applicants: Austin,  Poole,  Jennings, Natasha Lindsay, Joan Wilson, and Jacque Shelton. (Doc. 47, Ex. C at 103.)  Wilson did not have a masters degree, as required for the position, and was not considered after the initial screening; Shelton withdrew her application. (Doc. 47, Ex. J ¶ 4.)

Austin worked as an Admissions Specialist in the Admissions Department at UNA for approximately ten years. (Doc. 47, Ex. A at 25-26.)  She also taught word processing classes and communication classes in the business school. (*Id.* at 38-39.)  Austin has an undergraduate degree in management and an MBA from UNA. (*Id.* at 16-17.)  Her resume does not include any experience in events or facilities management. (Doc. 47, Ex. H, ex. 8 at 01206.)

Poole has an undergraduate degree in business administration from Jacksonville State and an MBA from UNA. (Doc. 47, Ex. B at 17-18.)  She has worked as an Administrative Assistant to the Vice President for Fiscal and Administrative Affairs since 1997. (*Id.* at 38-39.)  Her title later changed from "Administrative Assistant" to "Assistant." (*Id.* at 39.)  Her resume includes the following description of her job duties and experience in this position:

9

Coordinate assignments for the Vice President for Fiscal & Administrative Affairs. Create and compile Excel reports related to departmental budgets, and the University's Endowment Investment Portfolio. Also maintain a salary database for all University employees and communicate salary increases to the faculty and staff. Review contracts and ensure that appropriate signatures have been obtained. Gather data, compose, and evaluate statistical reports relating to salaries, budgets, benefits, etc. Resolve billing problems and verification of coverage with the International Student Insurance Program. Assist the Directors of Human Resources and Affirmative Action Office, Physical Plant, Business Office, Public Safety and Purchasing. Represent the University on the Higher Education Partnership Membership Task Force Committee and the Staff Council on the Planning and Institutional Effective Committee.

(Doc. 47, Ex. H, ex. 8 at 01220-21.) In addition, she had other experience as an owner/operator

of her own company, as an information systems specialist, and as a human resource manager,

primarily during the 1980's. (*Id.*, ex. 8 at 01221.)

Jennings worked as a Coordinator of Intramural Sports and Recreation, which is within

the Office of Student Life. (Doc. 47, Ex. C, ex. 8 at 01210.) He had a masters degree in

education. (*Id.*) Jennings had experience in scheduling and managing university events,

including responsibility for scheduling activities for Flowers Hall, a facility shared by Athletics,

Academic Affairs, and Student Life. (Doc. 47, Ex. H ¶ 5.) He also volunteered to serve as the

Advisor for the University Program Council, the programming branch of the Student

Government Association that is responsible for bringing concerts, comedians, lectures, and other

events to campus. (Doc. 47, Ex. I ¶ 5.) In that position, Jennings was responsible for many of

the same types of tasks that would be required of the Associate Director, such as negotiating

contracts, scheduling events and facilities, and working with public safety, physical plant,

custodial services, and other organizations to coordinate events. (*Id.*) Jennings had previously

organized and implemented Homecoming events and concerts. (Doc. 47, Ex. H, ex. 8 at 01210.)

10

## G.  The Search Committee Is Formed

UNA has no written policy dictating how a search committee is to be selected. (Doc. 47,

Ex. A at 115; Ex. H ¶ 8.)  Lovett sought to have representatives on the committee from those

areas that interact frequently with UE, and he contacted the directors or chairpersons from

several areas requesting recommendations. (Doc. 47, Ex. C at 105.)  The committee ultimately

included the following eight persons (listed by Department and by person who recommended the

committee member):

- Chairperson Alice Gross (female; dob 4/24/51) - Recommended by Staff. Selected as chair of committee by  Lovett.
- Linda Allen (female; dob 7/29/51) - Public Safety - Recommended by Jim Glasso, Director of Public Safety.
- Mike Hall (male; dob 3/12/61) - Assistant Professor of Health/Physical Education and Recreation - Recommended by Dr. Jim Colligon, Chair of the Department of Health, Physical Education and Recreation.
- Carol Lyles (female; dob 8/6/49) - Alumni Relations - Recommended by Dr. Dan Howard, the Vice President for Advancement.
- B.J. Mann (female; dob 6/10/65) - Director of Housing and Residence Life - designated herself as representative for the Housing and Residence Life Department.
- Aston Rhoden (male; dob 9/23/63) - Department of Athletics - Recommended by Dan Summy, Athletic Director.
- Laura Dale Lee (female; dob 9/12/80) - Student - Recommended by Greenway.[4]
- Corlandos Scott (male; dob 11/8/81) - Student - Recommended by Greenway.

(*Id.* at 117-24, 127; Ex. B at 162-63.)  Lovett also sought a representative from Fiscal Affairs,

but the Vice President of Fiscal Affairs recommended Melissa Williams after the committee had

begun its work. (Doc. 47, Ex. C at 129-31.)  Lovett proposed to the committee that Williams

should be allowed to participate in the interview process, but not as a voting member. (*Id.*; Ex. C,

---

[4]The common practice at UNA is for students to serve on selection committees. (Doc. 47, Ex. D at 67-69.)  Greenway recommended Corlandos Scott and Laura Dale Lee because of their involvement in Student Government Association and their availability as students in the summer term. (*Id.* at 65-66.)

ex. 12.) Dr. Ernestine Davis, Assistant to the President for Minority Affairs, viewed much of the selection process to ensure that the committee provided equal opportunity to all applicants. (Doc. 47, Ex. C at 211; Ex. G at 34.)[5]

Greenway attended the interviews of the applicants as part of her normal practice for any position she would directly supervise. (Doc. 47, Ex. I ¶ 9; Ex. D at 74-75.) Greenway did not have a vote on the committee, and she did not participate in the committee's meetings during which it ranked the applicants. (Doc. 47, Ex. D at 80, 88.) Greenway had previously served as the Interim Director for University Events, and Poole acknowledges that Greenway knew more about the operation of UE than anyone serving on the committee. (Doc. 47, Ex. B at 168, 241.)

Dr. Lovett did not attend any of the applicants' interviews, or any other meetings in which the committee discussed the applicants. (Doc. 47, Ex. C at 223-26.) Lovett provided input to the committee on procedural matters, such as the appropriateness of the use of a time limit for the case studies and the scope of Dr. Davis's involvement in the proceeding because one of the applicants had listed her as a reference. (*Id.* at 224-25; Ex. H ¶ 11.)

On April 19, 2001, Lovett sent an e-mail to the members of the committee informing them that they needed to complete their work in an expedited fashion:

> Summer camps and conferences are important as the major income source for University Events and as a significant student recruitment opportunity for UNA. When campus is "enjoying" summer school, University Events is operating at 125% to ensure that the camps and conferences are successful (and profitable) both for the current year and for the future. The viability of University Events

---

[5]An issue was raised by the committee as to whether Dr. Davis should be an active participant on the Committee because she was listed as a reference for one of the applicants. (Doc. 47, Ex. C, ex. 26.) Lovett advised that Davis was welcome to view the process but, because she was a reference for an applicant, it would not be proper for her to actively participate in the screening process. (Doc. 47, Ex. C at 146-47; Ex. C, ex. 27.)

depends upon current camps returning and new camps being attracted to UNA. Much work remains to be done to get ready for the summer and time is short. I'm asking Alice [Gross] to schedule your meetings for early next week and, if possible, have your work finished by April 27.

(Doc. 47, Ex. C at 133-36 and ex. 11 at 00755.)

### H. The Committee Conducts Its Work

The selection process involved several aspects. First, the eight committee members evaluated the qualifications of the applicants on a scale of 1-10 (with 10 being the best score) in nineteen separate categories, for a total possible score of 1,520 (i.e., 8 members x 19 categories x 10 best score per category). (Doc. 47, Ex. J ¶ 5.) The scoring by the committee on the applications was as follows:

| | |
|---|---|
| Carolyn Austin | 687 |
| Natasha Lindsey | 783 |
| Sandra Poole | 930 |
| Bret Jennings | 1235 |

(*Id.*) In addition to scoring the applicants based on their job-related education and experience, the committee also scored the applicants on the following elements: (1) their responses to four case studies; (2) their interviews with and presentations to the committee; and (3) their interviews with the UE Staff. (*Id.* ¶¶ 7-9.)

#### 1. Case Studies

On April 23, 2001, each candidate was provided with four case studies; their responses were due at 4:00 p.m. the following day. (Doc. 47, Ex. B at 204 and ex. 14-15.) Poole submitted her responses to Gross, committee chairperson, with a cover letter complaining that "the time frame given to complete a response was inappropriate" and that "given this time frame and limited resources, it was impossible to research these questions as adequately as I would have

preferred." (Doc. 47, Ex. B, ex. 16.)  Poole copied Potts,  Lovett, Davis, and Howard on her letter. (*Id.*)

Lovett responded to Poole's complaint by e-mail stating that the screening committee had advised him that "each applicant was given the same amount of time (basically 24 hours) to respond to the four case studies." (Doc. 47, Ex. B, ex. 17.)  Lovett advised that he was not consulted on the time limitation, but he commended the committee for establishing such a deadline because "the successful candidate will be required to work with time limitations and deadlines imposed by external interests and in many cases will have to respond with limited information." (*Id.*)  Lovett advised the committee that it was appropriate to submit the case studies under time constraints as long as "the playing field was level." (Doc. 47, Ex. C at 145.)

Alice Gross removed the applicants' names from the case studies, so scoring would be anonymous. (Doc. 47, Ex. B ¶ 7.)  Gross did not rank the case studies herself because she knew which applicant submitted each case study. (*Id.*)  The committee members ranked the case studies on a scale from 1-5 (with 1 being the highest ranking). (*Id.*)  Thus, the best possible score was a 28 (*i.e.*, score of 1 x 4 case studies x 7 members), and the worst possible score was 140 (score of 5 x 4 case studies x 7 members). (*Id.*)  The combined scores from the case studies were as follows:

| | |
|---|---|
| Carolyn Austin | 62 |
| Natasha Lindsey | 79 |
| Sandra Poole | 71 |
| Bret Jennings | 67 |

(*Id.*)

## 2. Interviews and Presentations

Each applicant was scheduled on May 8-9, 2001, to give a 10 minute oral presentation of a proposal to secure new business for the University Center (doc. 47, ex. A at 144; ex. J ¶ 8), followed by a committee interview after the completion of the "sales" presentation (doc. 47, ex. J ¶ 8). The committee asked each of the applicants the same standard interview questions, which the committee had compiled prior to the interviews. (*Id.*) One applicant, Natasha Lindsey, was unable to attend the interview/presentation because she was on a leave of absence. (*Id.*) The committee rescheduled Lindsey's interview and presentation for May 14, 2001. (*Id.*)

The applicants also interviewed with the staff members from University Events. (Doc. 47, Ex. C at 172.) Poole was asked during her interview with the staff whether she thought she would have enough energy to do all the hard work for the position, which she felt was inappropriate. (Doc. 47, Ex. B at 279.) Poole admits that the position requires a lot of energy. (*Id.* at 221.) The staff ranked the three applicants who attended these interviews and gave Gross the following rankings (on a scale of 1-5 with 1 being the best ranking and 5 being the worst):

| | |
|---|---|
| Bret Jennings | 2 |
| Sandra Poole | 2.5 |
| Carolyn Austin | 4.7 |

(Doc. 47, Ex. J ¶ 9.)

## I. Recommendation and Hire of Jennings

After the completion of the interviews and the presentations, the members of the committee (except Gross) submitted overall rankings for each applicant on a 1-10 scale with 10 being the highest. (*Id.* ¶ 11.) The overall rankings by the committee members were as follows:

| | |
|---|---|
| Carolyn Austin | 4.7 |
| Natasha Lindsey | 4.28  (only 5 ranked) |

15

| Sandra Poole | 7.05 |
| Bret Jennings | 9 |

(*Id.*)  Given that Lindsey had rated no better than third on the initial job qualification scoring and the case studies, the committee elected to make a conditional recommendation to hire Jennings before Lindsey's interview/presentation was conducted. (*Id.* ¶ 12.)  The committee believed, even if Lindsey had a strong interview/presentation, she would not move past both Poole and Jennings. (*Id.*)  The committee reserved the right, however, to revise its recommendation if Lindsey's interview changed the committee's rankings. (*Id.*)

By memorandum dated May 10, 2001, Gross submitted the recommendation of the committee that Jennings be selected for the position of Associate Director of Student Life/University Events. (Doc. 47, Ex. C, ex. 23.)  Gross advised in her memorandum that the committee would advise Greenway if Lindsay's interview on May 14, 2001, led to a different applicant being selected. (Doc. 47, Ex. C at 189-90.)  The committee's endorsement of Jennings did not change after Lindsey's interview/presentation. (Doc. 47, Ex. J ¶ 13.)

On May 14, 2001, after all interviews were completed, Greenway submitted a memorandum to Robert Steen, Director of Human Resources and Affirmative Action, through Lovett, advising that the committee had recommended Jennings for the position and stating her concurrence with the committee's decision. (Doc. 47, Ex. C at 186 and ex. 24.)  Lovett also concurred with the committee's recommendation. (Doc. 47, Ex. C at 193-94.)

By letter dated May 15, 2001, President Potts offered Jennings the position of Associate Director of Student Life/University Events. (Doc. 47, Ex. C, ex. 25.)  Jennings accepted the offer with an effective start date of May 16, 2001. (*Id.*)

## II. Summary Judgment Standard

Summary judgment is appropriate when "there is no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). The party asking for summary judgment bears the initial burden of showing that no genuine issues exist. *See Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991); *see Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970). Once the moving party has met its burden, Rule 56(e) requires the nonmoving party to go beyond the pleadings and show that there is a genuine issue for trial. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986). A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

In deciding a motion for summary judgment, the judge's function is not to "weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Id.* at 249. Credibility determinations, the weighing of evidence, and the drawing of inferences from the facts are left to the jury, and therefore the evidence of the nonmovant is to be believed and all justifiable inferences are to be drawn in her favor. *See id.* at 255. Nevertheless, the nonmovant need not be given the benefit of every inference but only of every *reasonable* inference. *See Brown v. City of Clewiston*, 848 F.2d 1534, 1540 n.12 (11th Cir. 1988).

## III. Discussion

Plaintiffs claim they were denied promotion to the Associate Director position at issue because of their sex, female, and their age. Absent direct evidence, a plaintiff must prove a prima facie case of discriminatory failure to promote under the *McDonnell Douglas* burden

17

shifting analysis by establishing:[6] (1) she is a member of a protected group; (2) she was qualified and applied for promotion; (3) she was rejected despite her qualifications; and (4) other equally or less qualified employees who are not members of the protected class were promoted. *Lee v. GTE Florida, Inc.*, 226 F.3d 1249, 1253 (11th Cir. 2000). Under the ADEA, the plaintiffs need not prove the successful applicant is outside the protected class, but instead must show that the successful applicant is "substantially younger." *See O'Connor v. Consolidated Coin Caterers Corp.*, 517 U.S. 308, 313 (1996). Once a plaintiff establishes a prima facie case of discrimination, the burden shifts to the employer to articulate some legitimate, nondiscriminatory reason for the employee's rejection. *Lee*, 226 F.3d at 1253. If the employer meets this burden of production, plaintiff must then prove defendant's proffered reason for the employee's rejection is a pretext for unlawful discrimination. *Id.* If the plaintiff cannot discredit *each* of the employer's stated reasons for its actions, the employer is entitled to summary judgment. *Combs v. Plantation Patterns*, 106 F.3d 1519, 1529 (11th Cir. 1997)(discussing *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502 (1993)).

---

[6]The *McDonnell Douglas* framework applies to claims under Title VII, the ADEA, and their Equal Protection claims. *See Cofield v. Goldkist, Inc.*, 267 F.3d 1264, 1268 n.6 (11th Cir. 2001); *Whiting v. Jackson State University*, 616 F.2d 116, 122 (5th Cir. 1980). Plaintiffs' state law age discrimination claims are subject to the same analysis, and must also be dismissed if the federal age claim fails on the merits. *See Ala. Code* § 25-1-29; *see also Bonham v. Regions Mortgage, Inc.*, 129 F. Supp. 2d 1315, 1321 (M.D. Ala. 2001)("[B]ecause it is self-evident that the AADEA's purpose and prohibition are like the ADEA's, to promote employment of older persons based on their ability rather than age and to prohibit arbitrary age discrimination in employment, it follows that [the principles governing the order and allocation of proof in ADEA and Title VII cases] should govern in AADEA cases as well").

## A. Direct Evidence

Austin argues that Dr. Lovett's alleged statement "make no bones about it, I want Bret Jennings for that position" constitutes direct evidence of discrimination.[7] (Austin's Br. at 14-15.) "Direct evidence of discrimination is evidence, that, 'if believed, proves [the] existence of [a] fact in issue without inference or presumption.'" *Schoenfeld v. Babbitt*, 168 F.3d 1257, 1266 (11th Cir. 1999)(quoting *Burrell v. Bd. of Trustees of Ga. Military College*, 125 F.3d 1390, 1393 (11th Cir. 1997). "To be direct evidence, the remark must indicate that the employment decision in question was motivated by [a protected characteristic]." *Scott v. Suncoast Bev. Sales, Ltd.*, 295 F.3d 1223, 1227-28 (11th Cir. 2002). Each case cited by Austin in support of her direct evidence argument involves a statement that includes mention of the protected category upon which the plaintiff's case is based.[8]   In contrast to these cases, the statement attributed to Lovett that he wanted Jennings as the new Associate Director does not make any reference to a

---

[7]Poole does not contend that the record contains any direct evidence of discrimination.

[8]*See* Austin's Br. at 14 ("*Burns v. Gadsden State Community College*, 908 F.2d 1512, 1518 (11th Cir. 1990)(statement that 'no woman would be named to a B scheduled job' constitutes direct evidence [of gender discrimination]); *E.E.O.C. v. Alton Packaging Corp.*, 901 F.2d 920, 923 (11th Cir. 1990)(finding general manager's statement that 'if it were his company he wouldn't hire any black people' was direct evidence [of race discrimination]); *Sennello v. Reserve Life Ins. Co.*, 872 F.2d 393, 395 (11th Cir. 1989)(statement that 'we can't have any women in management' constitutes direct evidence); and *Bell v. Birmingham Linen Serv.*, 715 F.2d 1552, 1553, 1557 (11th Cir. 1983) (supervisor's statement that he would not put a woman in a washerman position because 'every woman in the plant would want to go to the washroom' constitutes direct evidence [of gender discrimination])."); *see also id.* at 16 ("*See, e.g. Alton Packaging Corp.*, 901 F.2d at 923 (comments by a decisionmaker 'that if it was his company he wouldn't hire any black people,' and 'you people can't do a ___ thing right' were direct evidence [of race discrimination]); *Buckely v. Hospital of America*, 758 F.2d 1525, 1527-28, 1530 (11th Cir. 1985) (in an ADEA case, direct evidence [of age discrimination] included the decision-maker's telling the plaintiff that she had 'lost her temper due to her advance age,' that the hospital needed 'new blood,' and that he wanted to attract younger doctors and nurses)").

protected characteristic, nor does the statement suggest in any way that age or sex motivated Lovett's preference for Jennings for the Associate Director position.  Lovett's statement is not direct evidence of discrimination.  Therefore, the court will consider whether plaintiffs can prove their claims using circumstantial evidence as provided under the *McDonnell Douglas* framework.

### B. Circumstantial Evidence

#### 1. Prima Facie Case

Both Austin and Poole have established a prima facie case of discrimination: each is a member of two separate protected classes (gender and age), each met the minimum qualifications to be considered for the promotion, each applied for the promotion and was rejected, and someone outside the protected class, Jennings, was selected.

#### 2. Legitimate, Non-Discriminatory Reasons

Defendants offer three reasons for Lovett's decision.  First, he based his decision, in part, on the recommendation of the committee, which was provided after the committee had conducted a detailed and thorough review of the applicants' qualifications.  Second, Lovett based his decision on the recommendation of Greenway, who was Director of Student Life and who would be held responsible for the operation of the newly merged UE/Student Life department.  Greenway had supervised Jennings to some extent while he worked in the Office of Student Life, and she had recommended him for Associate Director based upon her first-hand review of his job performance. Third, Lovett recommended Jennings for the position based upon his own independent knowledge of Jennings's performance at UNA. (Doc. 47, Ex. H ¶ 12.)

These three reasons are legitimate and non-discriminatory.  Therefore, plaintiff has the burden to show that each reason is pretextual.

### 3. Pretext

Plaintiff may establish that an articulated reason is a pretext for unlawful discrimination "either directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence." *Carter v. City of Miami*, 870 F.2d 578, 584 (11th Cir. 1989)(quoting *Goldstein v. Manhattan Industries*, 758 F.2d 1435, 1445 (11th Cir. 1985)(citing *Burdine*, 450 U.S. at 256)). If a plaintiff chooses to establish pretext by showing that his employer's proffered reason is unworthy of credence, he must attack that reason "head on and rebut it." *Chapman v. AI Transport*, 229 F.3d 1012, 1030 (11th Cir. 2000).  She must offer evidence that "casts sufficient doubt on the defendant's proffered nondiscriminatory reasons to permit a reasonable fact finder to conclude that the employer's proffered 'legitimate reasons were not what actually motivated its conduct.'" *Combs*, 106 F.3d at 1538 (quoting *Cooper-Houston v. Southern Ry. Co.*, 37 F.3d 603, 605 (11th Cir. 1994)); *see also Damon v. Fleming Supermarkets*, 196 F.3d 1354, 1361 (11th Cir. 1999).

Austin and Poole make substantially the same arguments regarding pretext, namely that Lovett pre-selected Jennings for the position, and therefore, his articulated reasons are unworthy of credence.  However, plaintiffs have not offered evidence sufficient to show that each of defendants' articulated reasons were pretext for unlawful discrimination.

As evidence of preselection, Poole points out that Lovett announced at a "Brunch Bunch" meeting before a selection committee was put together that he planned to fill the newly created

Associate Director position with Jennings, and that he declared that there were no other individuals qualified for the position.[9]  However, the evidence is undisputed that Lovett wrote an e-mail the day before the meeting in which he stated his intention was "to advertise the position as an internal promotional opportunity and to do so quickly," and that the position was in fact competed. (Doc. 47, Ex. H, ex. 2.)  Furthermore, even if Lovett favored and/or preselected Jennings from the outset,[10] plaintiffs have not demonstrated that Lovett preselected Jennings because of a protected characteristic, *i.e.*, because of his age or because he was male, and not because of his qualifications.  *See Philon v. Rice*, 758 F. Supp. 724, 726 (M.D. Ga 1991) ("preselection is not barred by Title VII when it is based on the qualifications of the successful applicant and not on a forbidden factor")(citing *Goostree v. Tennessee*, 796 F.2d 854, 861 (6th Cir. 1986)("Preselection, of course, does not violate Title VII when such preselection is based on the qualifications of the preselected party and not on some basis prohibited by Title VII.")).  There is simply no evidence tending to show that Lovett was motivated by discriminatory intent.

---

[9]Defendants moved to strike the first statement signed by Jo Bennett, which includes the remarks from the brunch bunch meeting attributable to Lovett, on the basis that it was not made under oath and thus is not admissible.  In response, plaintiff submitted an additional affidavit executed by Jo Bennett that is virtually identical to the first affidavit with the notable exception that the second one was made under oath.  Therefore, the court finds defendants' Motion to Strike is due to be denied as moot.  However, as the court explains, the contents of Bennet's affidavit do not create a genuine issue of material fact as to whether Lovett's reasons for selecting Jennings are unworthy of credence.

[10]Implicitly, through their contention that Lovett favored Jennings from the outset, plaintiffs argue that defendants cannot defend Lovett's reliance on his own independent recommendation of Jennings as an additional legitimate, non-discriminatory reason for hiring Jennings over them.  Plaintiffs do not, however, support this argument with any evidence showing that Lovett preferred Jennings because of his age or gender.

22

In addition, plaintiffs argue that Lovett's reliance on the committee's recommendation is suspect because he exerted improper influence over the committee proceedings. They point out that Lovett hand-selected many committee members who, in their employment with UNA, reported directly to him, that he allowed Greenway, another supporter of Jennings, to select other committee members, and that he refused to allow two other individuals, Davis and Williams, to participate as voting members of the committee. Plaintiffs contend any recommendation coming from the allegedly hand-selected committee members is tainted by Lovett's involvement.

There is no evidence that the search committee considered gender or age in its deliberations or that the committee recommended Jennings for promotion because of his gender or age.[11] Plaintiffs also offer no evidence that the committee members were given instructions by Lovett as to whom they should select.[12] The committee focused its review of the candidate's qualifications on the relevance of the applicant's background compared to the required duties of the Associate Director job.[13] As has been held before, the court will not second guess an

---

[11]Presumably, the committee, which was comprised of five women and three men, with four members over the age of forty, would not be inclined to discriminate on the basis of protected characteristics that its individual members had in common with plaintiffs. *See Elrod v. Sears Roebuck & Co.*, 939 F.2d 1466, 1471 (11th Cir. 1991)(stating that members of a protected class are more likely to be the victims of discrimination than its perpetrators).

[12]The fact that Lovett and Greenway selected committee members does not, in and of itself, mean that those committee members did not act independently. More importantly though, even assuming they voted for Jennings because of Lovett's influence does not indicate that Jennings was hired because of his gender and/or age.

[13]Any employer may reasonably choose the applicant with the most job-related experience. *See Malacara v. City of Madison*, 224 F.3d 727, 730 (7th Cir. 2000)(affirming grant of summary judgment for employer where promotion "decision was based on which candidate they believed to have the most relevant experience for the duties of [the position]"). This is particularly true given that the successful applicant here was going to need to *immediately* work at full speed given the approaching summer camps and conferences. *See Fisher v. Wayne-Dalton Corp.*, 1997 U.S. Dist. Lexis 7086 (N.D. Ill. 1997)(granting summary judgment for

employer's decision to emphasize certain qualifications over others in employment decisions. *Coefield v. Goldkist, Inc.*, 267 F.3d 1264, 1269 (11th Cir. 2001).

Absent any evidence Lovett actually corrupted the committee's work, plaintiffs' speculation that Lovett influenced the committee's selection amounts to little more than quarreling with the employer's decision to hire Jennings instead of them. Such evidence is insufficient to prove that Lovett's reliance on the committee's recommendation was pretext. *See Lee*, 226 F.3d. at 1253 ("We have explained that 'a plaintiff may not establish that an employer's proffered reason is pretextual merely by questioning the wisdom of the employer's reasons, at least not where . . . the reason is one that might motivate a reasonable employer.'")(citation omitted).

Plaintiffs argue that the sham nature of the selection committee is further demonstrated by the fact that plaintiffs were substantially more qualified for the Associate Director position than Jennings. However, neither Poole nor Austin has offered evidence on which a reasonable jury could find that they were substantially more qualified than Jennings. *See Lee*, 226 F.3d at 1254 ("'[D]isparities in qualifications are not enough in and of themselves to demonstrate discriminatory intent unless those disparities are so apparent as virtually to jump off the page and slap you in the face.'")(quoting *Deines v. Texas Dept. of Protective & Regulatory Servs.*, 164 F.3d 277, 280 (5th Cir. 1999)). Austin points out that she has an MBA and experience teaching classes in the business school. Austin's resume reflects that she has served ten years as a Graduate Admission Counselor, but makes no reference to any experience in event management

---

employer where successful applicant "had the knowledge and skill to fill the new position immediately without any production delays").

24

or facilities management.  Poole has an MBA and some experience in other relevant areas, including limited experience at a previous place of employment coordinating company employee relations functions such as Christmas parties and picnics.  Her resume does not, however, reflect any experience coordinating events on the scale of a music concert or University Homecoming. Jennings has a masters degree and significant experience performing many duties he would be called on to perform as Associate Director, including negotiating contracts, scheduling events and facilities, working with public safety, physical plant, custodial services, and other organizations in coordinating events.  He had organized and had implemented events on campus including Homecoming, Spring Fling, and musical concerts.  He had also gained additional experience from attending seminars on facilities management.

Furthermore, the committee as a whole felt that Jennings outperformed Poole in the case studies task, and both Austin and Poole in the interview and oral presentation portions of the selection process.  The committee awarded Jennings the highest number of combined points for the nineteen scoring categories, and ranked him overall the highest candidate – out of the four candidates, Poole was second and Austin was third.[14]

Finally, there is no evidence that Greenway's recommendation that Jennings be placed in the position was motivated by gender or age.  At best, plaintiffs can argue only that Greenway showed favoritism toward someone already under her supervision for a legitimate nondiscriminatory reason.  Such bias is not prohibited under the discrimination laws.  *See*

---

[14]Plaintiffs make generalized complaints about the selection process.  However, plaintiffs put forth no evidence that the selection process somehow facilitated discrimination on the basis of gender or age.

25

*Womack v. Runyon*, 147 F.3d 1298, 1300 (11th Cir. 1998)(stating that favoritism based on factors other than a protected characteristic does not implicate the anti-discrimination laws).

In sum, the court finds that plaintiffs have not offered sufficient evidence to allow a fact finder to disbelieve defendants' articulated reasons. As such, defendants are entitled to judgment as a matter of law.


## IV. Conclusion

For the reasons stated herein, the court finds defendants' Motion for Summary Judgment is due to be granted. An Order in accordance with this Memorandum Opinion will be entered contemporaneously herewith.

**DONE** this the 29th day of March, 2004.

**SHARON LOVELACE BLACKBURN**
United States District Judge

26